Argued July 13; affirmed September 6; rehearing denied November 14; second petition for rehearing denied December 5, 1933

RAHLES ET AL. *v.* SELLING ET AL.

(24 P. (2d) 1034, 27 P. (2d) 1118)

*Manning & Harvey,* of Portland, for appellants.

*Roscoe C. Nelson* and *Edgar Freed,* both of Portland (Simon, Gearin, Humphreys & Freed and Dey, Hampson & Nelson, all of Portland, on the brief), for respondents.

BELT, J. This is a suit to enforce an oral agreement alleged to have been made by the late Ben Selling with plaintiffs that if they would remain in his employ until his death or retirement from business he would bequeath to them his clothing store business which he maintained in the city of Portland. The

alleged contract included not only the stock of merchandise and fixtures but accounts receivable. It is averred that Ben Selling made this offer to plaintiffs during the years 1904 to 1921, inclusive, and that they accepted the same and, with the exception of plaintiff Ward, remained continuously in his employment until his death on January 15, 1931. Relative to Ward, it is alleged that he temporarily left the employment of Selling for periods of several months during 1912, 1916, and 1920, but with the understanding and agreement at the time of leaving that he would have the right to return to such employment without forfeiting any rights under the alleged contract. Ward returned in 1921 and remained continuously in the employment of Selling until the latter's death. Plaintiffs further allege that Selling died leaving an estate of an appraised value of $1,500,000, and in his will failed to make provision to carry out his agreement with his employees. The will, which was executed on April 26, 1929, provided among other things that the trustees were to sell and dispose of the business carried on by him at Fourth and Morrison streets and liquidate the business "as rapidly as the same can safely and conveniently be done".

The executors of the estate, the decedent's widow and son, proceeded to carry out the terms of the will and, after operating the store for about one month, sold the same. Plaintiffs seek to enforce the alleged oral agreement by impressing a trust upon the proceeds of the sale. They also ask for an accounting.

Defendants, in their answer, denied the making of any contract by Ben Selling with the plaintiffs to bequeath them the store or any interest therein.

The trial court dismissed the suit. Plaintiffs appeal.

■ While there are some interesting legal questions presented, we prefer to dispose of this case upon the simple and direct issue of fact, viz.: Did Ben Selling make the contract as alleged? He is not here to talk back. His lips are forever sealed. We must therefore closely scrutinize the evidence in this attack upon his estate. The evidence must, indeed, be clear and convincing before it can be said that Ben Selling, who it is conceded was a man of honor and integrity, broke faith with his employees. In this type of case, character is a potent factor. When an alleged breach of contract is inconsistent with the life and conduct of the party accused, a court of equity will pause and reflect.

At common law and in some jurisdictions, when one of the parties to an alleged contract is dead, the other is not permitted to testify. The oral admissions of a party must be viewed with caution. How much more stringent should be the rule when oral admissions are introduced in evidence against one who is not here to explain or contradict them. With these general principles in mind—so well recognized that no authorities need be cited—we pass to a consideration of the facts.

■ The record looms large relative to the business sagacity and integrity of this successful pioneer merchant. He was painstaking and methodical in all of his business transactions. He always had his hand upon the throttle and no detail escaped his attention.

At the time of the alleged agreement he owned several stores in the city of Portland. It is gleaned from the record that he was thoughtful and considerate to all of his employees. He paid above the average wage scale, allowed a liberal bonus to his salesmen, and never deducted from wages on account of

sickness. All of the stores, with the exception of the one at Fourth and Morrison streets, were sold prior to the death of Mr. Selling. Yet there was no protest from any of the plaintiffs! Soon after his death we find 35 of his employees, among whom were the plaintiffs, addressing a petition to Dr. Lawrence Selling asking that the store be sold to "some one that has the intention of keeping it as a going business". It is reasonable that these employees should be concerned about the loss of their positions, but their attitude is utterly inconsistent with the claim of contract. The explanation of plaintiffs that they did not know such a verbal promise could be enforced does not ring true. If such was their belief, why did they not ask him to reduce the agreement to writing?

When the claim was originally made it included only the stock of goods valued at approximately $90,-000. When suit was instituted "accounts receivable" exceeding $100,000 in value was added. On February 10, 1931, Ben C. Wing, who was dismissed as a party plaintiff at commencement of trial, wrote to the son, Dr. Selling, submitting a proposition to collect the store accounts on a certain commission. Such conduct is inconsistent with his theory of contract. Wing was not called as a witness. Neither was Fred C. Crabbe, an old-time employee who refused to join as plaintiff, called to tell what he knew about any contract.

Assuming, as we have a right to do under the record, that Ben Selling was a shrewd business man and noted for the meticulous care which he gave to every business transaction, it is utterly unbelievable that from all his employees he selected the four plaintiffs as the sole and exclusive objects of his bounty. Several other old and trusted employees positively as-

serted that they never heard about any such contract. If it was the intention of Ben Selling to make an absolute gift of property alleged by plaintiffs to be worth $225,000, why did he overlook some of his "key men" and heads of departments? Why did he pass by Lester Sichel, his nephew, who worked for him many years and of whom he was very fond?

The contract as alleged is not reasonable or equitable. It is neither specific nor definite in its terms. It is said that Ben Selling made this agreement with his "old employees". How long was it necessary for an employee to serve in order to come under such classification? Was it ten years? Twenty years? Or thirty years? Was this large business institution, including its accounts receivable, to be divided equally among the survivors, regardless of the length of employment or the character of the services rendered? Was the cash boy to receive the same consideration as an executive trusted with the important task of buying goods amounting to thousands of dollars? Such a contract does not bear the earmark of Ben Selling whose life was devoted to well-considered philanthropic enterprises.

Joseph Simon was a lifelong intimate friend of Mr. Selling. He was his attorney and was always consulted about matters affecting his political and business welfare. Mr. Simon testified that no mention was ever made by Selling of any contract whereby he agreed to give his business to his employees. As a matter of fact, in the will which Mr. Simon prepared for Selling in 1911, there was a provision in keeping with the memorandum in the handwriting of Selling, directing a disposition of the store at Fourth and Morrison streets.

During the period in which the contract was alleged to have been made and afterwards, various proposals were submitted to Mr. Selling by some of his employees whereby they might acquire an interest in the business, but none of them were consummated on account of the lack of funds or the failure to agree upon some equitable and feasible plan. Again we say such conduct is not consistent with the claim of contract.

There is no doubt, as evidenced by the testimony of several reputable and disinterested witnesses, that Ben Selling at one time had in mind the formulation of some plan whereby certain of his old and trusted employees might acquire, upon liberal terms, an interest in the business. However, none of these witnesses undertook to say that Selling ever spoke of any contract with his employees to give them the business. It is evident that whatever charitable scheme or plan he had in mind at one time was abandoned in later years for reasons which to him seemed well founded.

It would fill many pages of the reports to review in detail the evidence. It is a voluminous record. In view of our conclusion relative to the facts, we consider it unnecessary to comment upon the various authorities cited. Each case is dependent upon its own particular facts. None are similar to the one at bar.

Having reached the conclusion that Ben Selling did not make any contract with plaintiffs as alleged, it follows that the decree of the lower court dismissing the suit is affirmed.

Petition for rehearing denied December 5, 1933

ON PETITION FOR REHEARING
(27 P. (2d) 1118)

BELT, J. In what might be designated as a second petition for rehearing, counsel for appellants courteously but earnestly criticize the opinion written on the original hearing, affirming the decree of the lower court. This case has received an unusual amount of attention, not only from the writer but from his associates on the bench. After such consideration we are convinced that the findings of the trial judge—who heard and saw the witnesses—are supported by the preponderance of the evidence. Although the evidence shows that the late Ben Selling talked much about "turning his business over" to his old employees—not to just these four plaintiffs—it does not show that he intended to make an absolute gift of this valuable property to them or that he contracted in any manner to turn it over to them. It appears from the evidence that he wished at some time to formulate some charitable plan whereby all his old employees would be enabled to carry on the business and pay for it in a limited way from the earnings. The evidence does not show that negotiations ever reached a point where there was a meeting of the minds. No contract was ever consummated.

The petition for rehearing is denied.